## LUSTGARTEN v. UNITED STATES.

### SAME v. UNITED STATES SHIPPING BOARD MERCHANT FLEET CORPORATION.

Nos. 13483, 13600.

District Court, E. D. New York.
Nov. 16, 1933.

Silas B. Axtell, of New York City, for libelant.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y., and William E. Collins, Sp. Asst. to U. S. Atty., of New York City, for respondents.

CAMPBELL, District Judge.

The two above-entitled suits were tried together and are in effect one suit, the first being brought by the libelant to recover from the United States of America, as owner, operator, manager, and controller of the steamship Coelleda, and the United States Shipping Board Merchant Fleet Corporation, as operator, manager, and controller of the steamship Coelleda; the second suit being brought by the libelant to recover from the United States Shipping Board Merchant Fleet Corporation, as operator, manager, and controller of the steamship Coelleda, for the same alleged personal injuries, failure to treat, and maintenance and cure of the libelant, which injuries are alleged to have been suffered by the libelant while a seaman on the steamship Coelleda.

The libelant, by his guardian, in December, 1926, commenced a common-law action against the United States Shipping Board Emergency Fleet Corporation and Consolidated Navigation Company, Inc., to recover damages for failure to treat, and maintenance and cure, arising out of the same alleged injuries as form the basis of this suit.

The action at law was tried before the court with a jury, and submitted to the jury only on the claim of failure to treat, resulting in a verdict in favor of the libelant, and judgment was entered thereon.

An appeal from that judgment was taken by the said defendants to the Circuit Court of Appeals for the Second Circuit, and the judgment appealed from was affirmed by that court. 28 F.(2d) 1014.

A writ of certiorari was granted by the Supreme Court of the United States on the application of the said defendants, and that court after hearing argument on that appeal rendered its decision on January 6, 1930, which is reported in 280 U. S. 320, 50 S. Ct. 118, 74 L. Ed. 451, holding that the United States of America being the registered owner of the vessel, the exclusive cause of action on behalf of a seaman injured on any such vessel was by a suit in admiralty, under the Suits in Admiralty Act (46 USCA § 741 et seq.).

By reason of the said decision of the United States Supreme Court, the said judgment was reversed and the judgment has been vacated and the complaint dismissed upon the ground that the common-law court never had jurisdiction thereof.

The two-year period in which the suit might be maintained under the Suits in Admiralty Act had then expired, and the libelant was without remedy in admiralty.

To meet this situation Congress passed the Act of June 30, 1932, c. 315, 47 Stat. 420 (which amended title 46, § 745, U. S. Code), 46 USCA § 745, to read as follows: "§ 745. Causes of action on which suits may be brought; limitations. Suits as authorized in this chapter shall be brought within two years after the cause of action arises: Provided further, That the limitations in this section contained for the commencement of suits hereunder shall not bar any suit against the United States or the United States Shipping Board Merchant Fleet Corporation, formerly known as the United States Shipping Board Emergency Fleet Corporation, brought hereunder on or before December 31, 1932, if such suit is based upon a cause of action whereon a prior suit in admiralty or an action at law or an action under subdivision (1) of section 250 of Title 28, was commenced prior to January 6, 1930, and was or may hereafter be dismissed because not commenced within the time or in the manner prescribed in this section, or otherwise not commenced or prosecuted in accordance with its provisions: Provided further, That such prior suit must have been commenced within the statutory period of limitation for common-law actions against the United States cognizable in the Court of Claims: Provided further, That there shall not be revived hereby any

suit at law, in admiralty, or under subdivision (1) of section 250 of Title 28 heretofore or hereafter dismissed for lack of prosecution after filing of suit."

It is by virtue of that act that these libels are filed.

In the common-law action the defendants were the United States Shipping Board Emergency Fleet Corporation and Consolidated Navigation Company, Inc., whereas in the admiralty suits the respondents are the United States of America and the United States Shipping Board Merchant Fleet Corporation.

On behalf of the respondent United States of America, it is contended that this court is without jurisdiction because, the United States of America not having been a party to the common-law action, this is not an action to recover on the same cause of action, and that the court not having jurisdiction, no one can confer jurisdiction over the subject-matter where none exists, nor subject the United States to suit by consent.

I have fully considered the question of jurisdiction in Adders v. United States, 5 F. Supp. 457, in this district, decided by me on September 5, 1933, and for the reasons set forth in that decision, I overrule the contention of the respondent United States of America as to jurisdiction, and hold that this court has jurisdiction.

The question of jurisdiction is not, and cannot be, raised by the respondent United States Shipping Board Merchant Fleet Corporation, which was formerly known as the United States Shipping Board Emergency Fleet Corporation, one of the defendants in the common-law action.

Ownership of the vessel by the respondent United States of America, its use as a merchant vessel, and the incorporation of the respondent, are admitted.

■ The libelant during the times hereinafter described was employed by the respondents aboard the steamship Coelleda, having signed regular merchant shipping articles for a voyage to England and return as an able-bodied seaman, at $62.50 per month and found. At or about Manchester, England, his rating was changed to that of second cook, at $80 per month and found.

On March 2, 1926, the Coelleda left Swansea, Wales, bound for the United States, and she was then in a good seaworthy condition, while there was water in what has been described in this case as a hollow rudder post.

This was equipped with a steam siphon for the purpose of removing such water, and the siphon was operating properly when the vessel left Swansea.

Extremely heavy weather was encountered on that voyage, the wind being up to gale force much of the time, and the vessel having continually head winds and head seas.

Due to the stress of weather on March 5th, there was about six inches of water in the lazarette. This continued to increase until March 10th, when it had become two feet.

As the water gained in the lazarette through the straining of the ship, the motion of the ship caused this water to slosh violently from side to side, and that carried away the shelving in the lazarette, which was used for stores, including a large wire hawser and other heavy material, which in sloshing to and fro carried away the sounding pipe, and also the dogs which secured the manhole door to the afterpeak tank, and that admitted salt water to the fresh water stowed in the afterpeak tank.

Another pump was thereupon rigged, which freed the lazarette of water, and some of the afterpeak tank which lies below the lazarette.

The water in the lazarette did not affect the steering of the vessel.

The vessel passed the Azores, but due to the prolonging of the voyage by reason of the stress of weather and the salting of the afterpeak tank, and the fact that if the weather continued as boisterous as had already been experienced, the master was not sure that he would have ample fuel for the remainder of the voyage, the vessel returned to the Azores.

The duties of the libelant as second cook on the steamship Coelleda were to bake, help the chief cook, wash pots and pans, peel potatoes, and dump ashes and garbage.

On or about the 6th day of March, 1926, between 6 and 7 o'clock p. m., after the whole dinner had been served, the chief cook ordered the libelant to dump the ashes that were in the galley. The libelant asked the chief cook to help him, but the chief cook did not reply. The libelant again asked the chief cook to help him, and the chief cook told libelant that it was libelant's job, and that he had to do it himself. The libelant said that he looked up and down to see if he could get some one to help him, and again asked the chief cook, and the chief cook ordered libelant to dump the ashes.

There is no evidence to contradict the libelant as to his conversations with the chief

cook, and therefore that testimony must be accepted as true.

If the seamen witnesses called on behalf of libelant are to be believed, some were in positions where it is hard to understand how the libelant could have failed to see them.

It is true that the seamen in the deck department were not subject to the orders of the cooks, but it is hard to believe that they would not have rendered assistance if requested.

Libelant describes the receptacle containing the ashes as a barrel, and says that it weighed two hundred and fifty pounds.

This is clearly an error, as the libelant said the ashes to be dumped were those of the coal burned in the galley range during that day, and according to the libelant's witness Williams, an expert cook, not more than one hundred and fifty pounds of coal would ordinarily be consumed in the galley during a day, and the weight of the ashes would be about 20 per cent. of the weight of the coal, which would be somewhat increased by wetting. I find that with the five-gallon containers generally used, it would not exceed in weight about fifty pounds; or even if a container of the character described by libelant were used, containing the ashes of three hundred pounds of coal as the daily consumption, and wet down, it would not exceed one hundred pounds in weight.

Further, I am convinced that the libelant could not have lifted two hundred and fifty pounds.

I am convinced that the libelant was in error as to the character of receptacle used, and that no such receptacle was provided by or used on the steamship Coelleda for ashes in the galley, but that on the contrary the usual five-gallon cans were provided and used, and that in no event did the weight of the can of ashes dumped by the libelant exceed sixty pounds in weight, and that such a weight of ashes could have been safely dumped by the libelant, using ordinary care and caution.

No ash chute for use in dumping ashes and garbage was provided, and I am convinced that there is no general custom for their use on oil-burning ships, and that when provided, they are not provided as safety devices for the crew, but solely for the purpose of keeping the side of the ship clean.

Further, I am convinced that such chutes when used are not generally made fast to any plate, but are hooked over the rail so that they may be shifted to the leeward side of the ship when used, and that under the conditions of wind and sea then prevailing, no such chute could have been used, whether made fast to a plate or hooked over the rail, without almost certain danger of its being carried away, and instead of being a device for the safety of the man who was putting it to use, it would have been a source of danger to the man using it.

Under the stress of winds and waves then prevailing, there was some danger to any one on the decks of the vessel, but the men who go down to the sea in ships assume that risk.

The libelant, it appears to me, could have safely dumped the ashes by throwing them between the rails, but in attempting to throw them over the top rail he was met by water from a sea, and the movement of the ship and the bucket brought back with some force against his chest, or his chest was brought into contact with the rail, from which he received some injury.

At Manchester, England, the steward had left the ship and the duties of steward had been taken over by Mr. Abbott, the second officer, who assumed charge of the medicine chest with which the vessel was provided.

Abbott is no longer in the employ of the United States Shipping Board Emergency Fleet Corporation; in fact, he no longer goes to sea, but is employed on land by an insurance company, and I believe that his testimony is entitled to great weight.

About 7:30 o'clock p. m. on or about March 6, 1926, the day of the accident, the libelant, walking with a seaman Tyburski, came to Mr. Abbott's room on the steamship Coelleda, and the libelant reported to Mr. Abbott that he had been injured down aft when dumping ashes or garbage, or something, Mr. Abbott not being able to remember exactly what libelant said he was dumping, and that at that time the libelant had some blood on his shirt, evidently from spitting blood.

Mr. Abbott took the libelant down to the temporary hospital amidships for an examination to, if possible, find any injury. He removed the libelant's shirt and examined his chest, the only place where he said he had been injured, but he could find no mark or bruise, but libelant did have a cough and a fever. There was no blood on his head or face, and no skin had been scraped off.

Mr. Abbott found that the libelant's tongue was coated, and libelant complained of a headache. Libelant had some ashes and dirt over him. Mr. Abbott then gave the libelant a good dose of salts, the common treatment aboard ship for a headache and a

coated tongue, and washed him up, face and body, and found ashes but no blisters on libelant's back. Mr. Abbott saw the libelant, who was in a bunk in the temporary hospital, at about 4 a. m. the following morning, when he appeared to be all right, and again the following morning, and told libelant to stay in his bunk and not to move around, and temporarily relieved him of work. The next day about 4 o'clock a. m., Mr. Abbott saw libelant sitting up in his bunk coughing and seemingly having considerable trouble to get his breath. The port was open, and the wind was blowing in on him. Mr. Abbott closed the port and attended to him. From time to time thereafter Mr. Abbott saw the libelant at various times around the deck at his leisure and apparently getting along as well as could be expected.

The libelant told Mr. Abbott that he had helped the cook in the galley on one or two occasions, but he had no orders to do that from Mr. Abbott.

The master of the vessel did not while the libelant was in the temporary hospital go there, order the libelant to go to work, raise his head, get libelant's clothes, or place his hands on the libelant.

Mr. Abbott did not at any time prior to the time when the vessel was about to enter Ponta Delgada take the libelant to the bridge, the master of the vessel did not say: "I ordered that man to go to work and that is all. Give him another dose of salts." Mr. Abbott did not say, "Captain, you will kill him if you keep giving him Epsom salts," and the captain did not say, "That is what I want to do."

The libelant did assist the cook without any orders from the master or Mr. Abbott, and in making bread did cough blood into the bread, and the master seeing the libelant on the deck a few days after the accident relieved him from all duty.

The libelant is undoubtedly in error in his contentions with reference to his alleged visit with Mr. Abbott to the captain on the bridge, and the captain's visit to the ship's hospital.

I saw and heard the libelant, Mr. Abbott, and the master of the vessel, all of whom were called as witnesses on the trial.

The libelant, as he says himself, was treated by Mr. Abbott with kindness and consideration.

The libelant, just before the arrival of the vessel at Ponta Delgada, did speak about his eyes, and said that he could not see very well; his eyes bothered him at times.

On arrival at Ponta Delgada, the master of the vessel requested the boarding health officer to examine the libelant, which the boarding health officer did, and said that he was not sure what was the matter with him, and requested that libelant be sent ashore for the taking of an X-ray, to which request the master of the vessel at once acceded.

The master of the vessel was informed by the doctor that it was more prudent to put libelant ashore.

The master of the vessel had the libelant paid off at the Consulate.

The master of the vessel requested that the libelant be given a room in a hotel where he would receive better treatment and the most valuable medical attention. This the Consul agreed to take up with the doctor, and it was done.

The vessel, after taking on fuel and fresh water in the afterpeak tank, sailed, arriving in New York on the 28th or 29th of March, 1926, where the voyage ended.

About ten days after the libelant landed at Ponta Delgada, the United States Consul sent the libelant home in a Fabre Line boat which landed the libelant at Providence, R. I., and he went from there to New York by train, arriving about the 5th day of April, 1926.

The next day he saw Mr. Axtell at his office, and then went to the Marine Hospital at Staten Island, where he remained for about a month, and from which he was discharged at his own request on April 30, 1926.

The libelant was unable to work and attempted by rest and a diet to work a cure.

The libelant is now suffering from tuberculosis in the lungs and in the bone of a finger.

The development of the tuberculosis in the finger occurred a long time subsequent to the libelant's injury on the Coelleda, and I can find no connection between the tuberculosis in the finger and the injuries to the libelant while on the Coelleda.

The trouble from which the libelant is suffering in his right eye, the nature and severity of which according to the evidence of the experts on each side is in dispute, does not seem to me to be traceable to the injuries he received on the Coelleda, his only complaint about his eyes having been made just before arriving at Ponta Delgada, and it seems on this trial to have been largely in connection with headaches.

The libelant says he did not receive a cut on his forehead at the time he received

injuries while on the Coelleda, but that only the skin was scraped.

I believe Mr. Abbott, who washed and treated the libelant shortly after the accident, that there was no cut and no blood on the libelant's forehead at that time.

There is no evidence of any examination of the libelant's eyes to determine his vision prior to that time with which comparison can be made.

The tuberculosis in the lungs of the libelant did not develop until some considerable time after the accident on the Coelleda.

When the libelant was examined by his medical expert on April 6, 1926, about one month after the accident on the Coelleda, the expert testified that libelant showed no tuberculosis in the lungs, only suspicion of tuberculosis.

In the month of June, 1927, the libelant was again examined by his expert, and he testified that libelant then had tuberculosis in the lungs, which the medical expert for the respondents denied.

The libelant was undoubtedly predisposed to tuberculosis, and his manner of living, character and quantity of food, would play a large part in the development of the disease, and yet we really have no evidence of a character that is sufficient to convince me that the blow he received on the Coelleda caused or contributed to the later development of tuberculosis in his case. This view is strengthened by the testimony of libelant's medical expert, who in answer to my question, "In other words, if he had not met with this accident, he might or might not have developed tuberculosis, is that it? answered, "Yes, your Honor."

The vessel was undoubtedly seaworthy when she left Swansea. Never up to the time of the accident to the libelant, nor in fact up to the time when the water was discharged from the lazarette, hollow rudder post, and part from the afterpeak tank, on or after March 10, 1926, was the steering of the Coelleda in any way interfered with by reason of water in the hollow rudder post, lazarette, and afterpeak tank, and as there were but six inches of water in the lazarette on March 5, 1926, there could not have been one foot of water on March 6, 1926.

The Coelleda steered the same as she usually did under stress of heavy weather.

The Coelleda was not equipped with an ash chute, and it was not customary to have one on oil-burning vessels, and under the conditions then prevailing, the use of an ash chute would have been dangerous both to the vessel and the user, and ash chutes are not provided as safety devices, but simply for the purpose of keeping clean the side of the ship.

I am convinced that the libelant is in error as to the size of the receptacle used for ashes on the Coelleda which he dumped, and that no such receptacle was furnished or used on that vessel; but even if it was, there were provided in the galley on said vessel the usual and customary five-gallon cans for ashes, which the libelant should and could have used with safety, if ordinary care had been exercised in their use.

The vessel was seaworthy and libelant was solely at fault, and no negligence on the part of the vessel or any officer or member of the crew, other than libelant, has been shown, and no recovery can be had on such grounds.

There was no failure to properly treat the libelant.

Libelant was relieved from all duty from the time he reported to Mr. Abbott, after the accident, until he was discharged at Ponta Delgada, and treated with kindness and consideration.

What little work the libelant did on board the Coelleda after the accident was purely voluntary and contrary to the orders of Mr. Abbott, who had relieved him from duty.

I do not believe that the little work which the libelant did aboard the Coelleda was an exciting or contributing cause of his development of tuberculosis in the lungs a long time after, but if it was, the respondents are in no way to blame for the voluntary acts of the libelant, contrary to the orders of Mr. Abbott.

On all the evidence it is established to my satisfaction that the master of the Coelleda did not order the libelant to work after he was injured, and that no such conversation between the master and Mr. Abbott, on the bridge or elsewhere on the vessel, as testified to by libelant, ever took place.

The master of the vessel was not biased or prejudiced against the libelant; on the contrary, he was so much interested in doing what he could for the libelant, that it was largely through his efforts that the libelant received such good accommodations and medical treatment at Ponta Delgada.

The libelant unquestionably received some injury on the Coelleda. He received proper maintenance and medical attention on the vessel and at Ponta Delgada, and was sent home as a passenger.

752

Shortly after his arrival in New York, he went to the Marine Hospital on Staten Island, where he received proper maintenance and medical treatment, and was discharged at his request.

A discharge at libelant's request would ordinarily relieve the respondents from further obligation for maintenance and cure; but there seems to have been little that could have been done for the libelant at that hospital, while with rest and change for a reasonable time, and a proper diet, the tuberculosis, if it was developing, might have been arrested.

The libelant is entitled to recover from respondents the sum of $784, for maintenance and cure.

The libelant is entitled to a decree against the respondents for the sum of $784 for maintenance and cure, with costs, and the respondents to a dismissal of the libel as to the count of damages for personal injuries, and the count of damages for failure to properly treat the libelant, without costs.

A decree may be entered in accordance with this opinion. Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.